IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

CLINTON C.,

       Plaintiff,

v.                               Case No.: 1:22-cv-00489

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Complaint and Motion for Judgment on the Pleadings, (ECF No. 8), and Defendant's Brief in Support of Defendant's Decision, requesting judgment in her favor, (ECF No. 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion be **GRANTED** to the extent that it requests remand of the Commissioner's decision, (ECF

No. 8); the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No. 11); the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In December 2016, Plaintiff Clinton C. ("Claimant") filed for DIB, alleging a disability onset date of December 15, 2016 due to "obsessive compulsive disorder, depression, anxiety, COPD, vascular [necrosis] in ankle, shoulder injury, migraines, acid reflux, fluid retina, irritable bowel syndrome, and bipolar." (Tr. at 207, 221). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 113, 127). Claimant filed a request for an administrative hearing, which was held on November 28, 2018 before the Honorable Raymond Rodgers, Administrative Law Judge (the "prior ALJ"). (Tr. at 34-73). On February 15, 2019, the prior ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-33).

After the Appeals Council denied Claimant's request for review, Claimant filed a civil action in this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g). While the civil case was pending, Claimant filed a second DIB application on January 14, 2020, and he was found disabled as of June 1, 2020. (Tr. at 945). On March 26, 2020, the Court reversed the prior ALJ's decision and remanded the matter for proper consideration of the treating source opinions, including on the issue of absenteeism. (Tr. at 939). The matter was assigned to Michael Dennard, Administrative Law Judge (the "ALJ"). As instructed by the Appeals Council, the SSA would not disturb the conclusion on Claimant's other application that Claimant was disabled as of June 1, 2020. (Tr. at 945).

Therefore, the ALJ considered on remand the period from Claimant's alleged onset of disability on December 15, 2016 through May 31, 2020, the day before he became disabled. (Tr. at 729). The ALJ held an administrative hearing on June 16, 2021, and, upon request by Claimant's counsel, a supplemental hearing on February 2, 2022. (Tr. at 761-833). On February 16, 2022, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 726-60). The ALJ's decision became the final decision of the Commissioner on August 30, 2022 when the Appeals Council denied Claimant's request for review. (Tr. at 709-14).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed a Transcript of the Administrative Proceedings. (ECF No. 5). Thereafter, Claimant filed a Brief in Support of Complaint and Motion for Judgment on the Pleadings, (ECF No. 8), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11), to which Claimant filed a reply, (ECF No. 12). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 47 years old on his alleged disability onset date and 51 years old on May 31, 2020, the final day of the period under review. (Tr. at 729, 747). He completed high school, received specialized training in welding, communicates in English, and previously worked as an auto assembler, metal fabricator helper, retail clerk, and electric motor repairer. (Tr. at 61-62, 220, 222).

## III.    **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A

disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also*

*McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe

mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for DIB through December 31, 2021. (Tr. at 731, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from his alleged onset date through May 31, 2020. (Tr. at 732, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: arthritis of the left shoulder and left ankle, cervical and lumbar strain, chronic obstructive pulmonary disease (COPD), hepatitis C, obesity, chronic pain syndrome, headaches, bipolar disorder, anxiety, and personality disorder. (*Id.*, Finding No. 3). The ALJ also considered Claimant's gastroesophageal reflux disease (GERD) and irritable bowel syndrome, but the ALJ found that the impairments were non-severe. (Tr. at 732).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 732-36, Finding No. 4). Accordingly, the ALJ found that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can perform no operation of foot controls; occasional climbing of ramps and stairs but may never climb [] ladders, ropes, or scaffolds; frequent[] balancing; occasional stooping, kneeling and crouching; no crawling; frequent reaching with the left upper extremity; must avoid concentrated exposure to irritants such as fumes, odors, and dust; no exposure to hazardous machinery or unprotected heights. The claimant is able to understand, remember, [carry out], and maintain concentration, persistence, and pace to perform simple, routine tasks with simple instructions and simple work related decisions for two-hour segments. He needs a work environment that is goal-oriented rather than one that requires a specified pace consistently throughout a workday. He must work in a low stress job defined as only occasional decision-making and only occasional changes in the work setting. He can have occasional, superficial interaction with coworkers, such as providing the time of day or directions to the bathroom. He can have occasional interaction with supervisors and no interaction with the public. In addition to normal work breaks, he would be off task up to 5% of the workday.

(Tr. at 736-47, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any past relevant work. (Tr. at 747, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 747-48, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1969 and was defined as a younger individual age 18-49, but he subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of his transferable job skills. (Tr. at 747, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a mail clerk, electronic worker, and garment sorter. (Tr. at 747-48,

7

Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 748, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts two challenges to the Commissioner's decision. He argues that the ALJ did not properly analyze (1) the record evidence concerning absenteeism from work or (2) the treating psychiatry opinions regarding Claimant's mental limitations, particularly his ability to interact with others. (ECF No. 8 at 4-19). In response, the Commissioner claims that the ALJ was not required to assess any RFC limitations for Claimant's regularly scheduled medical appointments, properly considered the treating opinions that Claimant would be absent from work, and evaluated the opinion evidence regarding Claimant's social limitations. (ECF No. 11 at 13-20). In reply, Claimant argues that, although the ALJ generally rejected the opinion evidence, he did not provide any meaningful analysis on the issue of absenteeism, and the Commissioner provides nothing more than *post hoc* argument to support the decision. (ECF No. 12 at 1-2).

## V.    Relevant Medical History

The undersigned reviewed all of the evidence before the Court. The evidence that is most relevant to the instant matter is summarized as follows.

### A. Treatment Records

Claimant had regular office visits with Staci Linkous, PA-C,[1] at Southern Highlands Community Mental Health Center during the relevant period. On December 22, 2016, most of Claimant's mental status examination findings were normal, but his speech was

---

[1] PA-C Linkous is identified in some records under her unmarried name, Staci Craft, PA-C. *See* (Tr. at 38).

pressured, and he stated that he was not doing well. (Tr. at 388). His medications worked well, and things had improved in his marriage, but he still had racing thoughts, dwelled on matters, lost his job, and felt like killing someone. (Tr. at 388). During his next visit with PA-C Linkous on January 18, 2017, most mental status findings were again normal, but Claimant's speech was still pressured, and his mood was anxious. (Tr. at 342). He explained that he lost his job because he "talked too much." (*Id.*). Despite that, Claimant stated that he was doing well and had less racing thoughts. (*Id.*).

On January 27, 2017, Claimant complained of chronic left ankle and low back pain to Jenine Ward, FNP. (Tr. at 423-24). During his subsequent visit with PA-C Linkous on February 16, 2017, his speech remained pressured, and his mood was irritable. (Tr. at 648). On March 7, 2017, Claimant followed up with Kala White, FNP-BC, after being admitted to the hospital for pneumonia one week earlier. (Tr. at 419). He complained of left ankle pain and requested an orthopedic referral. (*Id.*). On March 16, 2017, Claimant told PA-C Linkous that he was doing a little better, but she again observed his pressured speech and irritable mood. (Tr. at 646). She documented that he was "hyperverbal." (*Id.*). After his primary care check-up on March 29, 2017, (Tr. at 1580), Claimant followed up with PA-C Linkous on May 11, 2017, (Tr. at 639). Although his mental status findings were still mostly normal, his speech was pressured, and he was irritable. (Tr. at 639-40).

On June 19, 2017, Claimant presented by referral to Anthony Dragovich, M.D., an anesthesiologist and pain medicine physician. (Tr. at 607). Claimant explained that he was in a car accident when he was 18 years old and underwent ankle reconstruction. (*Id.*). He stated that he suffered from severe left ankle pain in the past three years and applied for disability because he was unable to work. (*Id.*). Dr. Dragovich documented tenderness, edema, and crepitus in Claimant's left ankle and antalgic gait. (Tr. at 609-10). He

prescribed medication. (Tr. at 611).

Over the next several months, Claimant followed up with his primary care provider on June 14, August 2, and December 6, 2017 and April 11, 2018. (Tr. at 1564, 1568, 1572, 1576). He also presented for pain management appointments on July 17, August 14, September 18, October 17, November 14, and December 12, 2017 and January 25 and March 22, 2018. (Tr. at 547, 553, 562, 575, 580, 586, 594, 599). Claimant's mental status examinations were normal during his visits with PA-C Linkous on August 3 and October 26, 2017, as well as on January 10 and March 21, 2018. (Tr. at 631-38). However, on April 24, 2018, Claimant called PA-C Linkous's office "demanding Ativan." (Tr. at 1799). He spoke to a nurse, who documented that his speech was racing, and he cursed, yelled, continued to "counter back and forth," and asked the LPN why she "didn't like him." (*Id.*).

Claimant had subsequent pain management appointments on April 26, May 24, July 30, and September 24, 2018. (Tr. at 525, 530, 536, 673). His next three mental status examinations on June 1, August 24, and September 21, 2018 were normal. (Tr. at 629-30, 663-64, 695). During that time, Claimant also had examinations and testing for recurrent pneumonia, hypertension, primary care follow up, and appointments with gastrointestinal specialists on June 3, July 16, July 27, August 8, August 23, August 29, and November 8, 2018; February 19, March 15, April 23, July 19, October 23, and November 1, 2019; and March 6, March 10, May 15, June 8, June 16, June 22, and July 10, 2020. (Tr. at 449, 666, 668-69, 1533, 1538, 1542, 1546, 1550, 1554, 1559, 1909, 1904, 1914, 1919, 1921, 1923, 1925, 1939, 1942).

On May 31 and November 22, 2019, Claimant had fair insight and judgment. (Tr. at 1794, 1855). PA-C Linkous did not record Claimant's mental status findings during his appointment on August 30, 2019. (Tr. at 1860). On February 26, 2020, the mental status

10

examination findings were mostly normal, but Claimant's judgment was fair, and his mood was labile. (Tr. at 1844). He was doing "ok," yet had a very difficult time, including having thoughts of "bury[ing] his wife" and "burn[ing] the neighborhood down." (*Id*.). His wife was present for the appointment, and she confirmed that "it was bad." (*Id*.). On May 20, 2020, PA-C Linkous recorded that Claimant's insight and judgment were fair, and his stated mood was "anxious" (Tr. at 1842).

### *B. Opinions, Evaluations, and Prior Administrative Findings*

On March 6, 2017, psychologist Melinda M. Fields, Ph.D., performed a consultative mental status examination of Claimant. She documented Claimant's depressed mood, flat affect, impaired judgment, fair insight, and inability to recall any of the four words that she told him after a five-minute delay. (Tr. at 399). His social functioning appeared impacted by his depressed mood and flat affect. (Tr. at 400). Dr. Fields noted that Claimant was employed by Volvo for 13 years, but he was terminated for absenteeism. (Tr. at 399). He then worked for Walmart in the garage for six months, but he was again fired for absenteeism, and that termination occurred approximately three months before the present examination. (*Id*.). Claimant reported conflict with coworkers and customers on the job. (*Id*.).

On March 20, 2017, psychologist John Todd, Ph.D., assessed based on his review of Claimant's medical records that Claimant had a moderately limited ability to understand, remember, or apply information and mild limitations in adapting or managing himself; interacting with others; and maintaining concentration, persistence, or pace. (Tr. at 80). Dr. Todd concluded that Claimant's ability to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods

was not significantly limited. (Tr. at 86). Overall, Dr. Todd found that Claimant could perform short, simple, and routine one-to-three step tasks that were best presented in written instructions. (Tr. at 85).

PA-C Craft and psychiatrist Aliana Vrinceanu-Hamm, M.D., provided a letter dated March 22, 2017. The providers noted that Claimant was treated at Southern Highlands Community Mental Health Center since July 2010 for bipolar disorder. (Tr. at 415). PA-C Craft and Dr. Vrinceanu-Hamm expressed that Claimant's attempts to work were futile, and his symptoms minimally improved despite his compliance with treatment because of the chronic nature of his condition and resistance to treatment. (*Id.*). The providers opined that Claimant could not maintain employment. (*Id.*).

On April 10, 2017, Cindy Osborne, D.O., assessed Claimant's physical RFC based upon her review of his records. She concluded that Claimant could perform light exertional work with occasional postural activities, except for no climbing of ladders, ropes, or scaffolds; occasional reaching with left upper extremity; and no concentrated exposure to extreme cold, humidity, vibration, or hazards. (Tr. at 83-84). This assessment was affirmed by Palle Reddy, M.D., on June 15, 2017. (Tr. at 98-100).

Rosemary L. Smith, Psy.D., assessed on June 28, 2017 that Claimant had mild limitation in the area of adapting or managing himself, but moderately limited ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace. (Tr. at 96). His ability to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited. (Tr. at 101). Dr. Smith concluded that Claimant could carry out one-to-two step commands, maintain attention for extended periods of two-hour segments,

and sustain tasks that did not require production quotas and entailed only occasional and superficial interaction with others. (Tr. at 101-02). He could respond appropriately to the general public, co-workers, and supervisors. (Tr. at 102).

On May 8, 2018, Dr. Dragovich completed a form concerning Claimant's ability to do physical work-related activities. He opined that, due to Claimant's "severe left ankle post traumatic arthritis," Claimant could occasionally lift 10 pounds and frequently lift less than 10 pounds; stand and walk for two hours and sit for four hours maximum in a workday; change positions after sitting for one hour or standing for 20 minutes; walk around every hour for five minutes; shift positions at will from sitting or standing/walking; and lie down at unpredictable intervals during a work shift one to two times per day. (Tr. at 443-44). Dr. Dragovich further determined that Claimant could occasionally twist, stoop, and crouch; he could never climb stairs or ladders; and he had limited ability to push or pull in the standing position due to ankle degeneration. (Tr. at 444-45). Dr. Dragovich assessed that Claimant would miss work an average of three times per month due to his impairments or treatment. (Tr. at 445).

On November 21, 2018, PA-C Linkous and Dr. Vrinceanu-Hamm completed a mental RFC assessment form. They expressed that Claimant was treated at their practice since July 2010 on a monthly or bimonthly basis. (Tr. at 701). PA-C Linkous and Dr. Vrinceanu-Hamm concluded that Claimant had moderate, marked, or extreme functional limitations in every listed category, which included understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. at 702-04). They stated that Claimant's mental impairments would substantially interfere with his ability to work on a regular and sustained basis at least 20 percent of the time, and he would miss work more than four days per month due to his mental impairments or

treatment. (Tr. at 704). PA-C Linkous and Dr. Vrinceanu-Hamm opined that Claimant could not work on a regular and sustained basis because he was very unpredictable; easily agitated; intrusive; and unable to get along well with others, including being banned from public facilities such as the pharmacy. (*Id*.).

PA-C Linkous and Dr. Vrinceanu-Hamm authored another letter on April 1, 2019, stating that Claimant's symptoms waxed and waned since he began receiving services at Southern Highlands Community Mental Health Center in July 2010. (Tr. at 1990). He was currently treated for bipolar disorder and anxiety. (*Id*.). Although Claimant had a history of addiction, his symptoms remained consistent despite his sobriety; therefore, the providers believed that his mental illness was separate from his addiction. (*Id*.). PA-C Linkous and Dr. Vrinceanu-Hamm explained that, although Claimant showed signs of improvement, he remained very easily provoked, easily agitated, and paranoid. (*Id*.). His medications helped his symptoms, but his improvement was minimal, and without medication he believed that he would be "explosive." (*Id*.). Claimant also expressed suicidal ideation, but he denied it currently. (*Id*.). PA-C Linkous and Dr. Vrinceanu-Hamm noted that they received phone calls from several local pharmacies reporting that Claimant was banned due to his aggressive behavior. (*Id*.).

On April 23, 2020, Dr. Reddy again assessed Claimant's physical RFC, concluding that Claimant could perform light exertional work that involved no operation of left foot controls; occasional postural activities, except for no climbing of ladders, ropes, or scaffolds or crawling; frequent reaching overhead with the left upper extremity; no concentrated exposure to temperature extremes, vibration, pulmonary irritants; and no exposure to hazards. (Tr. at 956-58). Amy Wirts, M.D., affirmed this assessment on August 4, 2020. (Tr. at 975-77).

Psychologist Melinda Kay Henline, M.A., performed an adult mental status examination of Claimant on June 24, 2020. The findings were within normal limits except for Claimant's depressed mood; restricted affect; suspiciousness of others; suicidal ideation with no current intent or plan; and mildly deficient memory, concentration, and persistence. (Tr. at 1933). Nonetheless, Ms. Henline stated that Claimant's social functioning appeared severely impaired during the examination, he was noted to be depressed, and he struggled with tasks that required short term memory and concentration. (Tr. at 1933-34).

On June 24, 2020, psychologist Karl G. Hursey, Ph.D., concluded that Claimant had mild limitations in the paragraph B criteria, except for his markedly restricted ability to interact with others. (Tr. at 954). Dr. Hursey found that Claimant had severe mental/emotional impairments that produced significant functional limitations, but he could perform jobs that involved very occasional, brief interactions with supervisors and co-workers and no interaction with the public. (Tr. at 959-60). He specified that, once work was assigned, it should be able to be performed without coordination with others and tasks should entail working with things rather than people. (Tr. at 959).

On August 6, 2020, PA-C Linkous wrote a letter, stating that at Claimant's recent consultative examination it was deemed that Claimant also suffers from post-traumatic stress disorder in addition to his other diagnoses. (Tr. at 1958). Since that evaluation, he was reportedly very distressed and having flashbacks and nightmares of childhood sexual abuse, among other traumatic events. (*Id.*). PA-C Linkous explained that Claimant expressed suicidal ideation with a plan, and a safety measure was put in place to ensure his well-being. (*Id.*). She did not believe that there was any job that Claimant could adequately and safely perform, as his mental health was unpredictable and his behavior

was often erratic. (*Id.*).

On August 17, 2020, psychologist G. David Allen, Ph.D., concluded that Claimant had only mild limitation in understanding, remembering, and applying information and adapting or managing himself, but his ability to interact with others and maintain concentration, persistence, or pace were markedly limited. (Tr. at 972). Dr. Allen found that there was evidence of worsening, as indicated in the August 6, 2020 opinion. (*Id.*). Therefore, Dr. Allen found that Claimant satisfied listing 12.04 A1, B3 as of June 1, 2020. (*Id.*).

In an undated letter received by Claimant's attorney on October 21, 2021, PA-C Linkous listed that she diagnosed Claimant with bipolar disorder, post-traumatic stress disorder, generalized anxiety disorder, depression, and obsessive-compulsive personality disorder based upon her observation and his clinical presentation, as well as his symptoms and complaints during treatment. (Tr. at 1992). She treated him using a combination of medication and counseling, which provided some stability, but only a minimal reduction in symptoms because his condition was chronic and refractory to treatment. (*Id.*). Claimant consistently had periods of mild improvement followed by severe regression. (*Id.*). PA-C Linkous stated that Claimant was very unpredictable, easily agitated, intrusive, and unable to get along with others, as evidenced by her own observations and the fact that he was terminated from employment and banned from public facilities. (*Id.*). He had great difficulty controlling his temper and engaging with others; he made inappropriate statements; suffered from depression, anxiety, panic attacks, and racing/ruminating thoughts; tended to be hyper verbal; and could be loud in expressing himself. (*Id.*). In PA-C Linkous's opinion, based upon years of treatment, clinical observation, and his treatment record, Claimant could not work in any kind of

16

normal work setting. (*Id.*). His diagnoses substantially interfered with his ability to stay on task, and he would likely be off task at least 20 percent of the time. (*Id.*). In addition, he would miss work far too often on a monthly basis as a result of his diagnoses, likely more than four days per month. (Tr. at 1993). PA-C Linkous affirmed her prior mental RFC assessment, noting that Claimant could interact with others, concentrate, and persist for brief periods, but he could not do so in a work setting for eight hours per day, five days per week. (*Id.*). "He would be disruptive, difficult to work with, hyper verbal, and ultimately as he has in the past, be terminated from employment due to his behavior." (*Id.*). In addition, PA-C Linkous explained that Claimant would be distracted, get off task, have to be redirected, and be unable to maintain sufficient attention and concentration to complete tasks in a timely manner, and it is likely that he would be terminated for those additional reasons. (*Id.*). Finally, Claimant would be unable to deal with normal levels of work stress on a full time basis, as was shown in his past work experiences. (*Id.*).

### C. *Claimant's Testimony*

Claimant testified during his administrative hearing on June 16, 2021 that he had mental issues since he was a teenager and received treatment for the past 15 years. (Tr. at 802). He saw PA-C Linkous regularly. (*Id.*). Claimant stated that he suffered from anxiety and anger issues, which caused him to lose jobs and be banned from public places. (Tr. at 803-05, 816). He had racing thoughts and would fixate on something and talk about it exhaustively all day. (Tr. at 807-08). Claimant also lost jobs because he could not focus, and he had problems with his memory. (Tr. at 808, 813). He had five surgeries on his ankle, which caused constant pain and mobility issues. (Tr. at 821-26).

### D. *VE Testimony*

On February 2, 2022, in response to questioning by the ALJ, the VE testified that

employers would tolerate a maximum of one-half to one work absence per month for entry level unskilled positions. (Tr. at 782). Anything exceeding that would result in termination. (*Id*.).

### E. Other Evidence

On September 8, 2017, Drema Riffe, Branch Manager of Work Personnel Services, wrote a letter stating that Claimant was employed by Schaffner of North America on December 20, 2016, and he was fired the same day because he could not stay on task to learn his job due to excessive talking. (Tr. at 218). He was asked more than several times to stay on task, but he could not concentrate on learning the assembly-line job. (*Id*.).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

Claimant argues that the ALJ did not properly weigh his treating providers' opinions, although the matter was specifically remanded for that reason. The "treating physician rule" governs his application because it was filed in 2016.[2] Under the applicable law, the ALJ was required to consider the medical opinions along with the other evidence in the record. 20 C.F.R. § 404.1527(b). Medical opinions were defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id*. § 404.1527(a)(2). In general, the ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id*. § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id*. § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id*.

If the ALJ does not give the opinion controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017).

20 C.F.R. § 404.1527(c)(2)-(6).[3] The ALJ must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

### A. Absenteeism

Claimant contends that the ALJ did not articulate any substantive analysis of his potential absenteeism from work, although it was a material issue that was raised in the record. (ECF No. 8 at 4, 8). He points to evidence that he often had two pain management appointments per month, which were over one hour from his home, during the relevant period; his medical providers opined that he would miss three to four days of work per month; and the VE testified that one-half to one work absence per month would eliminate

all unskilled jobs. (*Id.* at 4-5). He anticipated that the Commissioner would likely argue that his absenteeism can be accommodated by regularly scheduled appointments, but it would be *post hoc* reasoning because the ALJ never provided that justification. (*Id.* at 7-8). Claimant cites a previous case that this Court remanded because the ALJ failed to discuss the issue of absenteeism, although the issue was raised by the evidence. (*Id.* at 8-9) (citing *Keaton v. Kijakazi*, No. 1:20-cv-00019 (S.D.W. Va. Oct. 21, 2021)).

In response to this challenge, the Commissioner argues that the ALJ was not required to assess any absenteeism limitations in the RFC to account for Claimant's regularly scheduled appointments. (ECF No. 11 at 13-14). Furthermore, the Commissioner argues that the ALJ properly considered the treating opinions and explained that they were inconsistent with the other evidence in the record. (*Id.* at 14-15). According to the Commissioner, this case is unlike *Keaton* in which the ALJ found prior administrative findings persuasive, but the ALJ did not adopt or address the absenteeism limitation that the expert assessed. (*Id.* at 15). Here, the Commissioner claims that the ALJ supposedly explained that the absenteeism limitations that Claimant's treating providers assessed were inconsistent with the prior administrative findings, Claimant's work history, and the objective evidence. (*Id.* at 15-16).

In this case, Claimant typically had multiple medical appointments per month during the relevant period, including regular appointments with his pain management physician, primary care provider, psychiatric providers, and others. *See, e.g.,* (Tr. at 342, 419, 423, 525, 526, 530, 537, 547, 548, 553, 562, 580, 594, 613, 618, 623, 630, 631, 634, 636, 637, 663, 673, 674, 695, 1533, 1538, 1542, 1546, 1554, 1564, 1568, 1572, 1576, 1580, 1794, 1835, 1844, 1855, 1914, 1925). Claimant was also fired from multiple jobs, including at least one job during the timeframe under review, due to absenteeism. (Tr. at 399).

Furthermore, as particularly relevant here, Claimant's treating providers stated that his impairments or treatment would result in excessive work absences. Claimant's pain medicine physician, Dr. Dragovich, opined in May 2018 that Claimant would miss work an average of three times per month due to his impairments or treatment. (Tr. at 445). Claimant's psychiatrist and psychiatric physician assistant, Dr. Vrinceanu-Hamm and PA-C Linkous, respectively, jointly assessed in November 2018 that Claimant would miss work more than four days per month due to his mental impairments or treatment. (Tr. at 704). They reiterated that opinion in a letter received by Claimant's attorney in October 2021. (Tr. at 1993). Critically, in response to questioning by the ALJ, the VE testified during Claimant's supplemental administrative hearing in February 2022 that employers would tolerate a maximum of one-half to one work absence per month. (Tr. at 782).

The ALJ considered some of the foregoing evidence concerning Claimant's medical treatment, the opinion evidence from Claimant's treating providers, and the VE testimony. Yet, the ALJ did not articulate any analysis of Claimant's ability to be present at work in accordance with employers' tolerances. As Claimant stated in his reply brief, the only mention of absenteeism at all in the decision is the ALJ's statement that Dr. Dragovich opined that Claimant would generally miss work three times per month. (Tr. at 745); *see* (ECF No. 12 at 2). The ALJ did not explain why he discounted Dr. Dragovich's opinion regarding work absences, nor did the ALJ even mention the psychiatric opinions that Claimant would be absent from work more than four days per month.

The Commissioner suggests that because the ALJ rejected the treating opinions overall, the Court can piece together the ALJ's analysis and conclusion regarding absenteeism. She also argues, as expected, that Claimant's regularly scheduled

appointments can be accommodated around his work schedule. While that may be true, it is nothing more than *post hoc* reasoning. The ALJ never provided that explanation, and the Court cannot discern the ALJ's reasoning without improper speculation. Furthermore, although past medical appointments alone are not *prima facie* evidence of absenteeism, a claimant can potentially establish future absenteeism by offering a medical opinion. *Prudich v. Saul*, No. 1:20-CV-00019, 2021 WL 933864, at *3-4 (S.D.W. Va. Mar. 11, 2021) (J. Faber). In fact, medical opinions are very helpful in that regard. *Id.* Claimant offered such evidence, but the portions of the opinions relating to absenteeism were overlooked.

After briefing concluded in this matter, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") issued an unpublished decision in *Dennis v. Kijakazi*, No. 21-2078, 2023 WL 2945903, at *6 (4th Cir. Apr. 14, 2023), which assists the Court's analysis of this issue. In *Dennis*, the claimant challenged the Commissioner's decision on the sole basis that she would be disabled by virtue of attending medical appointments and emergency treatment. *Id.* at *4. The district court affirmed the Commissioner's decision, stating that the claimant's record of mostly scheduled, non-emergency medical appointments—without more—did not require the ALJ to assume or address speculative future absences. *Id.* at *5. The Fourth Circuit reversed the district court's decision on appeal, stating that it could not meaningfully review the decision because the ALJ did not discuss the evidence supporting the claimant's need to miss work or adequately explain why the evidence should be rejected. *Id.*

Similarly, here, the ALJ did not discuss the evidence that related to the issue of absenteeism, including Claimant's medical treatment and the treating opinions, nor did the ALJ explain how that evidence impacted the RFC finding. The ALJ's error was clearly

not harmless because the VE testified that employers would tolerate no more than one-half to one day of missed work per month. The portion of the treating opinions relating to work absences, if given any weight, would have precluded all work, yet the ALJ failed to address that aspect of the opinions. The omission is particularly confounding given the fact that the Court previously remanded this matter specifically for the ALJ to properly consider the treating opinions, including on the issue of absenteeism. (Tr. at 939).

Claimant's appointments were scheduled, yet very frequent, for 12 months or more after his alleged onset of disability. His treatment did not typically rise to the level of emergency room visits, hospital admissions, or bi-weekly infusions like courts have often considered in other challenges regarding absenteeism. Still, the record in this matter was not so devoid of evidence to overlook the issue of absenteeism entirely. The evidence concerning Claimant's potential absenteeism, considered along with the VE's testimony that anything more than one-half day to one absence per month would preclude employment, necessitated explanation. *See Keaton v. Kijakazi*, No. 1:20-CV-00855, 2021 WL 5763843, at *12 (S.D.W. Va. Oct. 29, 2021), *report and recommendation adopted,* 2021 WL 5762195 (S.D.W. Va. Dec. 3, 2021) (citing *Janel G. v. Kijakazi*, No. 5:20-CV-00018, 2021 WL 3076407, at *10 n.10 (W.D. Va. July 21, 2021) ("Janel's treating neurologist opined that Janel would likely be absent from work about twice a month because of migraines. If credited by the ALJ, this would conflict with the VE's testimony that Janel would not be able to sustain full-time employment if she were absent from work more than one day per month. Thus, on remand, the Commissioner should re-evaluate Janel's treating neurologist's opinion and determine whether her migraines warrant additional RFC limitations.") (citations omitted); *Dimailig v. Saul*, No. 119-CV-441LMBJFA, 2020 WL 6749856, at *11–12 (E.D. Va. Nov. 17, 2020) ("Significantly, all

but five of plaintiff's doctor's visits over this period occurred on weekdays and presumably required her to miss work. Yet the ALJ's discussion of an absenteeism limitation was sparse," and despite VE testimony that two absences per month would preclude employment, "the ALJ did not adequately consider an absenteeism limitation, despite its clear relevance given plaintiff's medical history. More specifically, he failed to include that limitation in his hypothetical questions to the vocational expert. Accordingly, the ALJ's conclusion that an absenteeism limitation was not warranted should also be revisited on remand.").

The ALJ failed to explain how the pertinent evidence regarding absenteeism is reconcilable with the VE's testimony regarding tolerated absences in a manner that allows the Court to determine whether the ALJ's decision is supported by substantial evidence. For that reason, the undersigned **FINDS** that the ALJ's failure to discuss and explain the record evidence concerning absenteeism precludes meaningful review by this Court. *Dennis*, 2023 WL 2945903, at *5. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon the RFC and step five findings regarding Claimant's absenteeism.

The undersigned considered Claimant's argument that the Court should award benefits for the period under review, rather than again remand the matter to the Commissioner. However, when an ALJ fails to provide a logical explanation connecting the RFC analysis to the record evidence, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. *Carr v. Kijakazi*, No. 20-2226, 2022 WL 301540, at *4 (4th Cir. Feb. 1, 2022). A court can only direct the award of benefits if it is clear that the ALJ's decision denying benefits, properly explained,

could not be supported by substantial evidence in the record. *Id.* at \*4-5. Those circumstances are not present in this case.

### B. Psychiatric Opinions

Claimant further argues that the ALJ did not follow the Court's direction on remand to properly evaluate the psychiatric opinions of Dr. Vrinceanu-Hamm and PA-C Linkous. (ECF No. 8 at 10, 17). Claimant contends that the ALJ provided little analysis of the treating opinions, "cherry picked" the record to support his conclusions, and largely ignored the evidence that was supportive of Claimant's claim. (*Id.* at 10). According to Claimant, there was no persuasive contradictory evidence to disregard the psychiatric opinions, and they should have been controlling weight. (*Id.* at 17).

The ALJ considered the opinions from PA-C Linkous and Dr. Vrinceanu-Hamm that Claimant could not work; improved minimally with treatment for bipolar disorder because his condition was chronic and resistant to treatment; had marked and extreme functional limitations; was very unpredictable, easily agitated, intrusive, and unable to get along well with others, deal with criticism, or handle daily stressors; and had fluctuating mood from depressed to manic. (Tr. at 745-46). The ALJ found that some factors weighed in favor of the opinions, including the fact that the providers jointly treated and examined Claimant many times over the course of many years, and they were psychiatric practitioners. (Tr. at 746). However, the ALJ stated that the opinions were inconsistent with the medical evidence as a whole and not supported by the practitioners' records. (*Id.*). The ALJ noted that PA-C Linkous and Dr. Vrinceanu-Hamm referenced that Claimant could not get along with others or stay on task, but it appeared to be based on Claimant's subjective reports rather than their objective observations, as they "never reported observing such behaviors at appointments." (Tr. at 746). The ALJ cited that

Claimant reported at many appointments from 2018 through 2020 that he was doing well and stable on medications, which disputed that his medication minimally improved his symptoms. (*Id.*). The ALJ also determined that it seemed unlikely that Claimant would continue using the same medication if it was not helping that much. (*Id.*). Finally, the ALJ noted that Claimant's mental status examinations were generally normal, and he was not observed to be contentious, difficult to interact with, distractible, or unable to concentrate and remember things. (*Id.*).

As noted, the ALJ rejected the treating psychiatry opinions regarding Claimant's inability to get along with others and stay on task because those limitations seemed to be based on subjective complaints, rather than objective observations, and the providers never reported observing such behaviors at appointments. While it is true that Claimant's mental status examinations were largely normal and he generally interacted well with his providers, the ALJ did not consider key evidence that supported the psychiatric opinions. Dr. Vrinceanu-Hamm and PA-C Linkous expressly clarified that their opinions were based on their observations, Claimant's clinical presentation, and his symptoms and complaints during treatment. (Tr. at 1992).[4]

Furthermore, contrary to the ALJ's reasoning, PA-C Linkous personally observed and documented abnormal findings throughout the relevant period, including Claimant's pressured speech; anxious, irritable, and labile mood; and fair insight and judgment. (Tr. at 342, 388, 639-40, 646, 648, 1794, 1842, 1844, 1855). Dr. Fields recorded during Claimant's March 2017 consultative examination that Claimant suffered from depressed mood, flat affect, impaired judgment, fair insight, and inability to recall any of the four

---

[4] Although this letter was received by Claimant's attorney after the relevant period, the ALJ construed that it applied to the timeframe under review. (Tr. at 746).

words that she told him after a five-minute delay. (Tr. at 399). His social functioning appeared impacted by depressed mood and flat affect. (Tr. at 400). In April 2018, Claimant called Dr. Linkous's office yelling, cursing, demanding "Ativan," and asking the nurse why she "didn't like him." (Tr. at 1799). His speech was racing. (*Id*.). In April 2019, PA-C Linkous received phone calls from several local pharmacies, stating that Claimant was banned due to his aggressive behavior. (Tr. at 1990). In February 2020, PA-C Linkous observed Claimant's labile mood.[5] (Tr. at 1844). He expressed thoughts of "bury[ing] his wife" and "burn[ing] the neighborhood down." (*Id*.). Claimant's wife accompanied him during his appointment and said, "it was bad." (*Id*.). Less than four months later, Claimant was adjudged to be disabled because his mental impairments markedly restricted his ability to interact with others and maintain concentration, persistence, or pace. (Tr. at 972). Another consultative psychologist, Ms. Henline, observed in June 2020 that Claimant's social functioning was severely impaired, and he struggled with tasks that required short term memory and concentration. (Tr. at 1933-34).

It was critical for the ALJ to reconcile all of the information that supported the psychiatric opinions, not just the evidence that weighed against them. As the Court previously advised, the treating physician rule governed Claimant's application, and it was a "robust force to be reckoned with." (Tr. at 933). The opinions were entitled to controlling weight unless they were not based on medically acceptable clinical techniques or contradicted by other substantial evidence in the record. (*Id*.). Even if they were not entitled to controlling weight, the ALJ was obligated to consider the regulatory factors in determining the weight of the treating opinions. (Tr. at 934).

---

[5] "Emotional lability is a rapid and intense change in a person's emotions or mood, typically inappropriate to the setting." https://www.berkeleywellbeing.com/emotional-lability.html

Here, the ALJ purported to consider the factors, including the nature and length of the treatment relationship and the sources' specialization. (Tr. at 746). Those factors clearly weighed in favor of the opinions, as Dr. Vrinceanu-Hamm and PA-C Linkous are psychiatric practitioners who treated Claimant routinely over the course of many years during the relevant period. (*Id.*). However, the ALJ essentially disregarded those factors because the opinions were so overwhelmingly inconsistent with the evidence as a whole and not supported by Dr. Vrinceanu-Hamm and PA-C Linkous's own records. Given these facts, it was crucial for the ALJ to account for conflicting evidence and meaningfully explain how he weighed the treating psychiatric opinions. The ALJ failed to do so in this instance.

For those reasons, the undersigned **FINDS** that the ALJ's analysis of Dr. Vrinceanu-Hamm and PA-C Linkous's opinions is not supported by substantial evidence. On remand, the ALJ should reconsider or elaborate upon his analysis of those opinions.

## VIII.  Recommendations for Disposition

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion to the extent that it requests remand of the Commissioner's decision, (ECF No. 8); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall

have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  May 10, 2023

Cheryl A. Eifert
United States Magistrate Judge

31